UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>WARREN HAWKINS | Case No.<br>3:05cr58 (SRU) |

**RULING AND ORDER**

A jury convicted Warren Hawkins of conspiracy to distribute, or to possess with intent to distribute, a detectable amount of cocaine in violation of 21 U.S.C. §§ 846 and 841(b)(1)(C). Hawkins has filed a motion for a judgment of acquittal pursuant to Rule 29(c) of the Federal Rules of Criminal Procedure. In support of his motion, Hawkins argues that, although he purchased cocaine from members of the charged conspiracy, the evidence was insufficient to permit the jury to find that he joined the conspiracy. I agree, and therefore grant Hawkins' motion for a judgment of acquittal.[1]

**I.     Standard of Review**

   **A.     Motion for a Judgment of Acquittal**

Rule 29 provides that the court "must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). A defendant who seeks to overturn a guilty verdict on the ground that the evidence was insufficient, however, "bears a heavy burden." *United States v. Best*, 219 F.3d 192, 200 (2d Cir. 2000). A reviewing court must consider the evidence as a whole, not in isolation, and must defer to the jury's

---

[1] In light of this ruling, it is unnecessary to consider Hawkins' motion for a new trial, pursuant to Rule 33 of the Federal Rules of Criminal Procedure, which is denied as moot. Nor is it necessary to reach Hawkins' second argument in support of his Rule 29 motion, which addresses the government's summation.

determination of the weight of the evidence, credibility of witnesses, and competing inferences that can be drawn from the evidence. *Id.* The prosecution's proof does not need to exclude every possible hypothesis of innocence. *Id.*

In short, the reviewing court must view the evidence in the light most favorable to the prosecution and must reject the sufficiency challenge if the court concludes that "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original).

**II.    Evidence at Trial**

Hawkins and twenty-two co-defendants were charged in a thirteen-count superseding indictment. Hawkins was charged only in count one: conspiracy to possess with intent to distribute, and to distribute, cocaine[2] in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A) and 846.

Seventeen defendants pled guilty either to the crimes charged in the indictment or to other offenses. One "John Doe" defendant was never arrested. Three defendants, including Hawkins, elected to go to trial and to put the government to its proof. Over ten days, the government tried Hawkins with two co-defendants, Arcadio Ramirez and José Luis Rodriguez.

At trial, the government proved the existence of a conspiracy, led by one Alex Luna, to possess cocaine with intent to distribute, and to distribute, cocaine. Luna and his associates – which the government dubbed "the Luna organization" – distributed cocaine in the Danbury, Connecticut area from approximately December 2002 until March 4, 2005. Evidence of the conspiracy included the testimony of law enforcement officers and cooperating witnesses,

---

[2] The superseding indictment alleges that the conspiracy charged in count one also involved cocaine base, but there was no evidence whatsoever that Hawkins had any role in or knowledge of transactions involving cocaine base.

surveillance videos, and audiotapes of telephone conversations. Luna obtained quantities of cocaine from suppliers in New York City and met with his close associates at hotels in Danbury to process and package the cocaine for street sale.

The evidence involving Hawkins specifically was a small fraction of the evidence admitted during trial. The only evidence concerning Hawkins consisted of: (1) recordings of five intercepted telephone calls;[3] (2) the testimony of Special Agent Eileen Dinnan of the Drug Enforcement Agency; and (3) the testimony of Joshua Febres, one of Luna's associates, who was cooperating with the government.

In the five telephone calls, Hawkins discussed proposed drug purchases with Luna and Febres. On February 9, 2005, Hawkins spoke with Febres about purchasing five grams of cocaine for $23 per gram. Exh. 332A at 3. Febres testified that the proposed February 9 transaction never materialized. Tr. at 1383. During that call, Hawkins also spoke with Luna and expressed his desire to purchase cocaine from Luna in the future. Exh. 332A at 5-9; Tr. 1382-83. During the February 9, 2005, phone call, Hawkins also told Luna that he had recently seen Henry Mayoral, known as "Pac," a close associate of Luna's. Exh. 332A at 6; Tr. 1394, and Hawkins also stated that he had programmed Luna's telephone number into his cell phone. Exh. 332 at 6.

On February 12, 2005, Hawkins called Luna to purchase an eight-ball (i.e., 3.5 grams) of cocaine. Exh. 333A. Hawkins explained that he knew two individuals from work who were seeking drugs. *Id.* at 2.

> HAWKINS:　These kids . . . from work, like I got two (2) of them. Homie been calling me. He's . . . looking hard, man. Like . . . you

---

[3] Transcripts of the recorded telephone calls were introduced as full exhibits at trial. Exhs. 332A, 333A, 334A, 335A, and 336A.

know what I mean?

*Id.* (ellipses in original). Febres interpreted Hawkins' statements on that call to mean that Hawkins had two customers, who were looking for cocaine. Tr. at 1392-93. That same day, Dinnan was conducting surveillance of Luna and observed Hawkins meet with Luna in the parking lot of the Birchwood Condominiums, where Luna lived. Tr. at 1752-53.

On February 17, 2005, Hawkins called Luna to purchase two eight-balls. Exh. 336A at 2. Febres confirmed that he and Luna delivered two eight-balls of cocaine to Hawkins that evening. Tr. 1396.

On February 23, 2005, Hawkins called Luna, seeking to purchase another eight-ball of cocaine. Exh. 334A. He explained to Luna:

> HAWKINS: Listen, I just made out a child support payment. They got me for 1200. . . . So, I just went ahead and paid the shit and now I'm like total zero. But, I got this white kid, he waiting for me right now, he got a $100.00. I need a "8 ball" though. You know what I mean? I need to come from you right now and go give it to him and then hit you right back in the spot.

*Id.* at 3.

Luna agreed to meet Hawkins. Minutes later the two spoke again, and after Luna explained where to meet, Hawkins told him that Hawkins would "grab the dough from [the white kid] and come right back and hit you with it." Exh. 335A at 2.

In addition to the recorded phone calls, Febres testified that Hawkins purchased narcotics from members of the Luna organization. Febres also accepted the government's characterization of Hawkins as a "go-between." Tr. 1401. Specifically, Febres responded affirmatively ("Yes. I guess.") to the question: "Based on your understanding and your involvement in this

organization, is Mr. Hawkins serving as a go-between for this customer from New Milford and the Luna organization?" *Id.*

On cross-examination, Hawkins' attorney asked Febres whether Hawkins was a member of the Luna drug organization. Tr. 1432.

> Q. Is . . . Warren Hawkins a member of the Luna drug organization?
>
> A. As far as what? Selling drugs for him?
>
> Q. Yes.
>
> A. No, he bought drugs.
>
> Q. Okay, he bought drugs. Yep, he did. But did he ever sell drugs for the Luna drug organization?
>
> A. No.

*Id.*

## III. Discussion

The indictment charges Hawkins with one count: conspiracy to possess with intent to distribute, and to distribute, narcotics in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A) and 846. Notably, he was not charged with possession with intent to distribute, in violation of 21 U.S.C. § 841(a)(1), or with use of a communications facility to facilitate a narcotics transaction, in violation of 21 U.S.C. § 843(b). The evidence at trial was more than sufficient to prove either of those charges.[4]

To prove a narcotics conspiracy in violation of 21 U.S.C. §§ 846 and 841, the government

---

[4] Before trial the government offered to allow Hawkins to plead guilty to a substitute information charging him with use of a telephone to facilitate a drug transaction, in violation of 21 U.S.C. § 843. Although Hawkins had been provided copies of the intercepted phone calls in which he is heard arranging drug purchases, Hawkins declined the government's offer.

must establish two essential elements: (1) that the conspiracy alleged in the indictment existed, and (2) that the defendant knowingly joined and participated in it. *See United States v. Jones*, 30 F.3d 276, 281-82 (2d Cir. 1994). The government "need not prove the commission of any overt acts in furtherance of the conspiracy." *United States v. Shabani*, 513 U.S. 10, 15 (1994).

"The essence of conspiracy is the agreement and not the commission of the substantive offense." *United States v. Gore*, 154 F.3d 34, 40 (2d Cir. 1998). "As a matter of law, the crime of conspiracy must involve the agreement of two or more persons to commit a criminal act or acts since the act of agreeing is a group act, unless at least two people commit it, no one does." *Id.* (internal quotations marks omitted).

A. Existence of the Charged Conspiracy

Hawkins does not dispute that the government proved the existence of the conspiracy alleged in the indictment. The evidence at trial on that point was substantial.

B. Hawkins' Participation in the Charged Conspiracy

Hawkins claims that there was insufficient evidence from which a jury could find that he joined and participated in the Luna conspiracy. In order to prove a conspiracy charge against a particular defendant, the government must introduce "evidence from which it can reasonably be inferred that the person charged with conspiracy knew of the existence of the scheme alleged in the indictment and knowingly joined and participated in it." *United States v. Sanchez Solis*, 882 F.2d 693, 696 (2d Cir. 1989) (quoting *United States v. Gaviria*, 740 F.2d 174, 183 (2d Cir. 1984)). Once the existence of a conspiracy has been established, "though the link between another defendant and the conspiracy need not be strong, the evidence must suffice to permit the jury reasonably to find the element of that defendant's participation – like every element –

proven beyond a reasonable doubt." *Jones*, 30 F.3d at 281-82. For Hawkins to prevail on his Rule 29 motion, he must show that, "viewing the evidence in the light most favorable to the government, . . . no rational trier of fact could have found the essential elements of the crime charged beyond a reasonable doubt." *United States v. Leslie*, 103 F.3d 1093, 1100 (2d Cir.) (quoting *United States v. Taylor*, 92 F.3d 1313, 1333 (2d Cir. 1996)), *cert. denied*, 520 U.S. 1220 (1997).

1. *Evidence of Hawkins' Knowledge of the Luna Conspiracy*

The government adduced evidence from which it reasonably could be inferred that Hawkins knew of the Luna conspiracy. Febres testified, and the recorded telephone conversations show, that Hawkins purchased cocaine from Luna on several occasions. Hawkins was also familiar with Febres and Mayoral, two of Luna's co-conspirators, and the evidence suggests that he was aware of their participation in Luna's narcotics organization. Thus, rational jurors could have found that the government had proven beyond a reasonable doubt the first element of a conspiracy – that Hawkins was aware of an agreement between Luna and others to possess with intent to distribute cocaine.

2. *Evidence of Hawkins' Participation in the Charged Conspiracy*

The critical issue in this case is whether, viewing the evidence in the light most favorable to the government, rational jurors could find that the government proved beyond a reasonable doubt that Hawkins joined and participated in the charged conspiracy. If rational jurors could find that Hawkins agreed to join the conspiracy, then the government's proof is complete; if not, then Hawkins must be acquitted.

a. The Buyer-Seller Relationship

Based on Febres' testimony and the intercepted telephone calls, reasonable jurors could find that: (1) Hawkins purchased cocaine from Luna or Luna's co-conspirators; (2) Hawkins intended to resell some of that cocaine to other individuals; and (3) at least some of the Luna co-conspirators were aware of Hawkins' intent to resell cocaine. In other words, it would be reasonable to find that Hawkins did indeed function as a sort of "go-between," reselling to drug users some of the cocaine that had been sold to him by the Luna organization.

Whether those permissible findings are sufficient for reasonable jurors to find that Hawkins joined the conspiracy turns on the nature of the agreement essential to the crime of conspiracy. Every completed sale involves either an express or implied agreement between the seller and the buyer, whether the item being purchased is a house, a loaf of bread, or illegal narcotics. No sale can occur unless the parties agree on all essential terms. Here, Luna agreed to sell and Hawkins agreed to buy a particular quantity of cocaine for a particular price. Because the drug sales proven by the government involved hand-to-hand transfers, the agreement implicitly included an agreement that Luna and Hawkins would each sequentially possess the narcotics; Luna would possess the narcotics and hand them to Hawkins, who would then possess them. Luna was told that Hawkins intended to resell the narcotics, therefore we know that the possession by each was with an intent on the part of each participant to distribute the narcotics; Luna intended to distribute the narcotics to Hawkins, and Hawkins intended to distribute the narcotics to his customers.

If the agreement implicit in every sale of drugs can constitute the agreement necessary to satisfy the second prong of a conspiracy charge, the proof that Hawkins purchased narcotics from Luna with the intent to further distribute them would provide complete proof that Hawkins

-8-

agreed with Luna to possess with intent to distribute narcotics. If so, the logical extension of that principle would mean that every purchaser of narcotics who does not intend to personally consume the narcotics purchased would be guilty of the crime of conspiracy to possess with intent to distribute narcotics. I conclude that more is required.

The Seventh Circuit Court of Appeals, sitting *en banc*, has expressly held that the agreement at the heart of a narcotics conspiracy charge must be an agreement separate and distinct from the implicit agreement that arises from every purchase of narcotics.

> A conspiracy is not merely an agreement. It is an agreement with a particular kind of object – an agreement to commit a crime. When the sale of some commodity, such as illegal drugs, is the substantive crime, the sale agreement itself cannot be the conspiracy, for it has no separate criminal object. What is required for conspiracy in such a case is an agreement to commit some other crime beyond the crime constituted by the agreement itself. . . . But insofar as there was an agreement between [the parties] merely on the one side to sell and on the other to buy, there was no conspiracy between them no matter what [the buyer] intended to do with the drugs after he bought them. [The seller] would not, merely by selling to [the buyer], have been agreeing with [the buyer] to some further sale. A person who sells a gun knowing that the buyer intends to murder someone may or may not be an aider of abettor of the murder, but he is not a conspirator, because he and his buyer do not have an agreement to murder anyone.

*United States v. Lechuga*, 994 F.2d 346, 349 (7th Cir.) (*en banc*), *cert. denied*, 510 U.S. 982 (1993). The Seventh Circuit has expressly extended this reasoning to include the situation present in this case, that is, that the buyer of narcotics intends to resell them. "[W]hile purchase of narcotics for resale is *evidence* of a conspiratorial agreement (especially when the purchases are repeated as they were here), a buyer-seller relationship alone is insufficient to prove a conspiracy. This is the case even when the buyer intends to resell the purchased narcotics." *United States v. Mims*, 92 F.3d 461, 465 (7th Cir. 1996) (emphasis in original). "The buy-sell transaction is simply not probative of an agreement to join together to accomplish a criminal

objective beyond that already being accomplished by the transaction." *United States v. Townsend*, 924 F.2d 1385, 1394 (7th Cir. 1991).

To my knowledge, the Second Circuit Court of Appeals has not so clearly held that the agreement necessary to sustain a conspiracy conviction must be an agreement to accomplish an objective beyond the underlying sale of narcotics. The Second Circuit, however, has certainly implied as much. In *United States v. Gore*, the Second Circuit noted that "[o]ther Circuits have uniformly held that the mere relationship between a buyer and seller of drugs is not sufficient to show a conspiratorial agreement under § 846." 154 F.3d at 40 n.1 (citing *Mims* as well as decisions from the D.C., Sixth, Ninth, Tenth, and Eleventh Circuits). The Court then went on to adopt that position. "Without more, the mere buyer-seller relationship . . . is insufficient to establish a conspiracy." *Id.* at 40. *See also United States v. Medina*, 944 F.2d 60, 65 (2d Cir. 1991) (declining to apply buyer-seller rule to case involving "advanced planning among the alleged co-conspirators to deal in wholesale quantities of drugs obviously not intended for personal use"); *United States v. Beech-Nut Nutrition Corp.*, 871 F.2d 1181, 1191 (2d Cir. 1989) (noting "a mere buyer-seller relationship is not necessarily a conspiracy"); *United States v. Borelli*, 336 F.2d 376, 384 (2d Cir. 1964) ("A seller of narcotics in bulk surely knows that the purchasers will undertake to resell the goods . . . . But a sale or a purchase scarcely constitutes a sufficient basis for inferring agreement to cooperate with the opposite parties . . . , unless some such understanding is evidenced by other conduct which accompanies or supplements the transaction."); *United States v. Koch*, 113 F.2d 982, 983 (2d Cir. 1940) (Defendant-appellant "had no agreement to advance any joint interest. The appellant bought at a stated price and was under no obligation to [the alleged co-conspirator] except to pay him that price. The purchase

alone was insufficient to prove the appellant a conspirator . . . .").

In *Gore*, the Second Circuit reversed the judgment of conviction on a charge of conspiracy to distribute heroin, holding that the government had not satisfied the most basic element of a conspiracy charge – an agreement to distribute drugs. *Id.* at 41. The defendant had sold "Fuji Power" branded heroin and spoke with the informant concerning the quality of the heroin and his supplier, stating, "You always get something good and people don't appreciate it. Yeah man, I don't want to lose face with that dude man because he always has something decent and he always comes up right." *Id.* at 38. The government contended that it was reasonable to infer from that statement the existence of an agreement between the defendant and his supplier. *Id.* at 40.

The Court held that the defendant's sale of heroin with the label, "Fuji Power," was insufficient to show that he was part of a conspiracy to distribute heroin with that brand. *Id.* at 39. No witness testified to the defendant's participation in any conspiracy. *Id.* Moreover, the Court noted that the defendant's remarks from which one could infer a buyer-seller relationship with his source were legally insufficient to show a conspiratorial agreement to distribute drugs made between the defendant and his source. *Id.* at 40.

In both this case and in *Gore*, there was sufficient proof that a sale of drugs had occurred between the defendant and his supplier, and that the defendant intended to further distribute the purchased drugs.[5] If the purchase of drugs by one who intends to resell them satisfied every

---

[5] In *Gore,* evidence of the purchase from the supplier was circumstantial and evidence of the intent to sell was direct; here, evidence of the purchase from the supplier was direct and evidence of the intent to resell was circumstantial. That difference in the nature of the proof cannot matter; in each case, a jury could have found both a sale to the defendant and the defendant's intent to further distribute the drugs.

element of 21 U.S.C. § 846, *Gore* would have been decided differently. I therefore conclude that in *Gore* the Second Circuit held, *sub silentio*, that the agreement implicit in the purchase of drugs by the defendant from his supplier cannot constitute the agreement necessary to proof of a violation of section 846.

Although the Second Circuit has not expressly held as much, I conclude that the Court of Appeals would likely follow the Seventh Circuit's holding that the agreement necessary to proof of a conspiracy is an agreement to undertake unlawful conduct in addition to the purchase and sale transaction, even when the buyer intends to distribute the purchased drugs. I expect the Second Circuit to hold that, without more, the mere buyer-seller relationship is insufficient to establish a conspiracy, even if the seller knows that the buyer intends to resell the drugs. *Cf. Gore*, 154 F.3d at 40.

### b. Other Evidence of Agreement

The mere existence of a buyer-seller relationship is not sufficient, standing alone, to prove a conspiracy to possess with intent to distribute cocaine. Nevertheless, I must consider whether the other evidence in the record, when considered in conjunction with the buyer-seller relationship, is sufficient for reasonable jurors to find beyond a reasonable doubt that Hawkins agreed to participate in the Luna conspiracy.

In *Gore*, there was little besides the buyer-seller relationship to prove participation in the charged conspiracy. Here the government offered more evidence about Hawkins' relationships with his co-defendants. The record includes audiotapes of phone calls between Hawkins and Luna conspirators. In addition, Hawkins was seen meeting with Luna under circumstances suggesting the hand-to-hand delivery of drugs for money. The government emphasizes that Luna

trusted Hawkins, as shown by the fact that he met with him to deliver drugs. Significantly, Hawkins purchased drugs from Luna on more than one occasion. In addition, there was evidence from the intercepted phone calls that Luna knew Hawkins intended to distribute the cocaine that Luna sold him. All of this evidence was available to the jury and must be considered when deciding Hawkins' Rule 29 motion.

Luna's knowledge of Hawkins' intent still does not give rise to an agreement with respect to Hawkins' sales. Just as proof that Hawkins joined the Luna conspiracy requires both Hawkins' knowledge of the Luna conspiracy and his agreement to join it, so, too, proof that Luna sought to aid Hawkins' plan requires both Luna's knowledge of the Hawkins plan and his agreement to further it. There is no evidence in the phone calls or elsewhere in the record that would support a finding that Luna agreed to assist Hawkins with Hawkins' sales, except by supplying the cocaine – conduct that is insufficient to support a conspiracy conviction, for the reasons set forth above. "Where the buyer's purpose is merely to buy, the seller's purpose is merely to sell, and no prior or contemporaneous understanding exists between the two beyond the sales agreement, no conspiracy has been shown. No joint objective exists among the two, even though both are aware of the illegal nature of the goods." *United States v. Burroughs*, 830 F.2d 1574, 1581 (11th Cir. 1987).

As in *Gore*, the record here "is devoid of any conspiratorial conduct" on the part of Hawkins. 154 F.3d at 40. No witness testified to Hawkins' participation in the conspiracy or membership in the Luna organization. To the contrary, on cross-examination Febres testified that Hawkins was not a member of the Luna drug organization and never sold drugs for Luna. Tr. 1432.

The tapes of the intercepted phone calls provide conclusive evidence that Hawkins purchased cocaine from Luna, but they do not provide meaningful evidence that Hawkins agreed to work with Luna and his co-conspirators to further a joint goal. The phone calls set forth both Hawkins' efforts to purchase cocaine from Luna conspirators and Hawkins' remarks concerning his own customers – one of whom had $100 that Hawkins could use, effectively, to finance Hawkins' purchase from Luna.

Hawkins' two statements to Luna concerning two "kids . . . from work" and a "white kid" who were looking to purchase cocaine from him are insufficient to establish that Hawkins joined or participated in an agreement with Luna or Febres jointly to distribute or to possess with intent to distribute cocaine. *Cf. Gore*, F.3d at 41 (holding that defendant's statement made contemporaneously with heroin sale, pointing to the existence of a potential drug source, was "too thin a reed to support the essential element of a conspiracy – the agreement"). At most, those statements are consistent with the characterization that Hawkins acted as a "go-between." Tr. 1401. A "go between" is not necessarily a co-conspirator. *See Mims*, 92 F.3d at 463-64 (holding that defendant, who made as many as ten trips per night to facilitate sales between drug users and drug sellers, was not necessarily a conspirator; guilt would turn on proof of conspiratorial agreement). One who merely *functions* as a go-between without intending to further the goals of the conspiracy does not thereby become a conspirator, unlike one who intentionally facilitates transactions *in order to further* the aims of the conspiracy.

The level of trust shown by Luna toward Hawkins is not significant; Hawkins was shown some trust, but he did not hold a position of trust within the charged conspiracy. Luna permitted only trusted associates to "hold the phone," to carry drugs for Luna, and especially to attend

meetings at hotels where cocaine was cut and re-pressed for distribution. Hawkins did none of those things. The trust demonstrated by meeting face-to-face to sell drugs is the level of trust inherent in every street-level drug sale to end-users. No inference of conspiratorial agreement arises out of such sales.

Nor do other factors often considered as raising permissible inferences of conspiratorial conduct supply sufficient evidence to prove Hawkins' guilt beyond a reasonable doubt. The number of transactions and duration of the sales activity are not significant; there were a total of five phone calls and three drug transactions, all within the month of February 2005. The quantity of cocaine that Hawkins purchased, a total of 14 grams, does not suggest his participation in a conspiracy; indeed, that quantity alone does not even suggest distribution rather than personal use – it is only the phone calls that provide the evidence of an intent to distribute by Hawkins. There was no evidence whatsoever that either Luna or Hawkins possessed a shared stake in the sales of cocaine by the other; Hawkins never discussed paying Luna a cut of the proceeds, never received payments from Luna for activities on his behalf, never suggested that he was under Luna's control, never received instructions or encouragement from Luna, never referred to the purchased drugs as "Luna's drugs," never accounted to Luna for sales made or monies received, and never acknowledged acting on behalf of Luna or jointly with him. There was no evidence that Hawkins and Luna ever talked or met for a purpose other than Hawkins buying drugs from Luna; Hawkins was not connected to the supply, processing, or packaging of cocaine for sale, or to the solicitation or delivery of orders through the conspirators' cell phone. There was no evidence that Luna or his conspirators sought to promote Hawkins' sales in any way or that they provided Hawkins with "tools of the trade," e.g., firearms, packaging materials, or cell phones.

The government argues that Luna and Hawkins shared a common goal: to sell more drugs.[6] There are several problems with this argument. First, it uses the phrase "common goal" to describe similar goals. The pertinent inquiry when considering potential co-conspirators is whether their "common goal" is not merely similar, but is actually a shared or joint goal; here there is no evidence that Luna and Hawkins agreed to further a shared or joint goal. Second, there is not even any evidence that Hawkins had a goal of selling *more* drugs, i.e., that he planned any future sales. The evidence about him, his activities and his intentions is quite limited. One might assume that all drug dealers want to sell more drugs, but even accepting that assumption does not help prove an agreement between Luna and Hawkins. Nor is there any evidence that Luna cared what Hawkins did with the drugs. Luna's objective was accomplished once he received the sale proceeds from Hawkins. I share former Chief Judge Scullin's view that "the law of conspiracy in this Circuit demands proof beyond a reasonable doubt that Defendant intended to further or advance the . . . conspiracy's interests, not that he inadvertently or incidentally did so by buying, using and/or selling drugs that he obtained from the . . . conspiracy." *United States v. Santiago*, 2003 WL 21254423 at *7 (N.D.N.Y. 2003) (citations omitted). The necessary proof is lacking in this case.

In sum, considering all the evidence in the light most favorable to the government, the prosecution proved at most that it is plausible that Hawkins joined the conspiracy, but not that he joined the charged conspiracy beyond a reasonable doubt. *Cf. United States v. Jones*, 393 F.3d 107, 112 (2d Cir. 2004). The proof at trial was insufficient, therefore, to sustain the jury's

---

[6] Citing a goal to sell more drugs is not especially helpful in determining whether a particular defendant joined a conspiracy. Although all co-conspirators share that goal, not all people who share that goal are co-conspirators.

verdict. Accordingly, the Rule 29 motion is granted and Hawkins is acquitted of the charge in count one of the superseding indictment.

**IV.     Conclusion**

Hawkins' motion for a judgment of acquittal **(doc. # 642)** is **GRANTED**. A judgment of acquittal shall enter and the clerk shall close the case against Hawkins, who shall be released from custody forthwith.

It is so ordered.

Dated at Bridgeport, Connecticut, this 15th day of June 2007.

/s/ Stefan R. Underhill
Stefan R. Underhill
United States District Judge